IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Johnny Lee Paden, Jr., # 154700,     ) | |
|     ) | Civil Action No. 6:14-3335-TMC-KFM |
|     Petitioner,     ) | **REPORT OF MAGISTRATE JUDGE** |
|     vs.     ) | |
| Larry Cartledge,     ) | |
|     Respondent.     ) | |

The petitioner, a state prisoner proceeding with the assistance of counsel, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(c) (D.S.C.), this magistrate judge is authorized to review post-trial petitions for relief and submit findings and recommendations to the district court.

## BACKGROUND

The petitioner is currently incarcerated at the Perry Correctional Institution of the South Carolina Department of Corrections. The petitioner was indicted by the Greenville County Grand Jury in May 2006 for murder (Indictment No. 2006-GS-23-4246) (app. 410–11). He was represented by Daniel J. Farnsworth. On November 26–27, 2007, a jury trial was held before the Honorable C. Victor Pyle, Jr., South Carolina Circuit Judge. The jury convicted the petitioner of murder, and Judge Pyle sentenced him to life in prison (app. 1–136, 412).

## FACTS

The following facts were presented at the petitioner's trial.  On January 29, 2006, at about 6:40 a.m., Greenville City Police Department ("GPD") Officer Zoila Diaz overheard a caller speaking Spanish to dispatch.  Subsequently, she was dispatched to an apartment in Greenville County with two other officers to assist in translating (app. 39, 103). When Officer Diaz arrived, she "observed blood everywhere.  It was on the screen door. It was on the door itself.  There was blood on the floor."  A young Hispanic man was lying dead on the floor surrounded by large amounts of blood on the floor.  Other officers and the coroner observed the same thing as they arrived at the scene (app. 50–51, 64–65, 76–77). Three Hispanic men were sitting in the apartment.  Officer Diaz asked them what happened, but they did not respond (app. 42–43).  Officer Diaz testified that she spoke with Sammy Espinoza, the man who had called 911 because he spoke English (app. 44–46, 152).  Officer Diaz also spoke to the other Hispanic men, but was not allowed to testify as to what they said upon objection from the petitioner's counsel.  The trial court also sustained trial counsel's hearsay objection to Diaz's testimony regarding Margarito Lopez, who told her that a black man stabbed the victim (app. 46).

Greenville County Coroner Kent Deal testified that, during the processing of the scene, he bagged the victim's hands with clean paper bags in order to preserve any evidence of an altercation that could identify a suspect.  An autopsy was conducted.  The coroner's office and GPD Detective Dan Fuller subsequently identified the victim as eighteen-year-old Jorge Gonzalez Hernandez (app. 80–82, 101, 106, 107, 166, 175).

As the homicide investigation continued, Detective Fuller determined that Gina Marie Parker was present at the time of the murder, and a warrant was issued for her arrest.  Subsequently, officers located Parker and the petitioner, whose nickname was "John-John," at a duplex about three blocks from the murder scene.  Parker was arrested as an accessory to murder at that time.  Based on information obtained from Parker, Fuller

2

arrested the petitioner for murder, and he was transported to the law enforcement center (app. 109–113, 115, 123).

Parker, the petitioner's girlfriend, testified at trial that she had an abusive relationship with the petitioner. She was friends with the victim and several other Hispanic males who lived in the same apartment complex. She stated that the petitioner had a problem with the victim before and had given the victim fake drugs. The night before the murder, Parker and the petitioner went to the victim's apartment. During the visit, Parker sat beside the victim, and he and his roommates asked her for crack and gave her $20.00. According to Parker, she, the petitioner, and the victim went out to buy drugs in a nearby neighborhood. While they were walking to the neighborhood, Parker loaned the victim her jacket. When they reached the neighborhood, they asked a man in a car for drugs. The man drove them to another location to get the drugs. The driver left and returned with fake drugs, which resulted in a loud argument between the petitioner and the driver. The driver ordered the petitioner and Parker out of the car and left with the victim still in the car. Afterward, Parker and the petitioner started physically fighting. After she had been beaten by the petitioner, Parker returned to the victim's apartment to get her jacket (app. 198–201, 206, 207–12, 214–15, 218–20). As she was walking home from the apartment, the victim came up to her and grabbed her arm. She did not think he was threatening her, and she walked away to go home. Right after that, she saw the petitioner running fast toward the victim. She saw the petitioner push the victim. She corroborated that the petitioner always cut crack with a razor that he had on him at all times. When the petitioner returned to her, he physically assaulted her. Then they went home, and she went to sleep (app. 221, 225–31, 233–34, 239, 240, 241). Around 1:00 or 2:00 in the afternoon, GPD detectives knocked on the door. After she was Mirandized, Parker spoke with Detective Fuller (app. 236–37).

3

The petitioner was taken to the Greenville law enforcement center and Mirandized. At that time, the petitioner gave two voluntary statements to Detective Fuller and Officer Bobby Carias. The petitioner waived his right to an attorney. After the first statement was read to the petitioner, the petitioner wanted the statement revised by removing the first paragraph, which was about the petitioner's drug selling activity and about the events leading up to the murder. The second statement was the same as the first without the first paragraph. In the statement, the petitioner stated:

> . . . so I had this razor and I took it and I pushed that Mexican right in the chest to get him off of her. That is what any man would do for a woman. I have reenacted on Detective Fuller just what I did to get him off of her. I had the razor in my right hand and I hit him on his upper chest just one time

(App. 124). During the trial, Detective Fuller demonstrated the petitioner's actions during the interview. The petitioner had shown Fuller how he had hit the victim in the chest with a pen-type razor multiple times (app. 125). Fuller testified:

> Q    Detective Fuller, would you, please, demonstrate on this person, and do you want me to use my pen. Or?
>
> A    No thank you.
>
> I moved around my chair -- this interview initially -- Johnny Lee Paden was in a chair next to a table like this. It might have been more or less over here. By this time I moved my chair over here so there's no barrier between us. And I'm asking about this razor and he's describing it as a little pen type razor with a push-up blade. From my experience I can remember in the garage having a little pen type razor with a push-up blade. So I'm holding out my pen and asking him if he's talking about something like this? And he said, Yeah, yeah. And he says he pushed it up just a little bit and he's using his thumb and forefinger to demonstrate a distance for me about like what I'm doing. Maybe an inch. Says he pushed that blade up just an inch. And he hits me right there above my left nipple, on my left upper chest. Over and over again. And I estimated at least six times. I'm asking him. Did you slash, stab, what did you do? And he's re-enacting for me several times, hitting me just like that. Right there with the pen. Show me what he did.

4

Q     And how many times did he do that?

A     At least half a dozen.

Q     And were each of these times in the same spot on your chest?

A     Yes.

Q     Did he talk about the weapon or describe it's length?

A     Just a small push-up pen type razor with a push-up blade.

(App. 124–25**).**

After signing the statement, the petitioner was arraigned and put in jail (app. 25–28, 117, 120, 123). Detective Fuller then executed a search warrant on the petitioner's home where he collected items worn by Parker and the petitioner to be tested for DNA by SLED (app. 129–30, 175).

Sammy Espinoza, the 911 caller, also testified at the petitioner's trial. Espinoza's son leases the apartment building where the crime occurred, and Espinoza lived two apartments away. The four residents of that apartment were manual laborers who had lived there for several months. They did not speak English, and Espinoza would translate for them. They also did not have a phone (app. 144, 147). On January 29, 2006, Espinoza was awakened by Maragarito Lopez Solano knocking on his door. The trial judge sustained two objections by trial counsel when the witness attempted to testify about what Lopez Solano had told him (app. 147–48). Espinoza went into the apartment where the victim was lying on the floor, with his feet outside of the apartment. The victim was still breathing. Espinoza and Lopez Solano, who also lived in that apartment, were the only other people in the apartment. Because it was raining, they pulled the victim all of the way into the apartment. Espinoza made several attempts to call 911 before his call was finally answered, and he reported the stabbing (app. 148, 152). Espinoza testified that the victim

5

tried to speak, and Espinoza had to "go down with [his] ear and turn down." He testified that the victim kept saying, "moyo, moyo." Espinoza asked Lopez Solano, "What's a moyo?" Espinoza testified that Lopez Solano replied, "[T]hat's a black man" (app. 152).

The petitioner testified at trial that he saw Parker and the victim on the street at the time Parker had returned to the victim's apartment complex to get her jacket. He testified that he saw the victim grab Parker and that he heard a yell and that is when he started to run. The petitioner stated that he had a little razor with him and pushed up the blade a little. The petitioner said he ran up to the victim and pushed him telling him not to ever touch Parker, but that he did not cut him. After he pushed the victim, the petitioner stated that they walked away in different directions (app. 264–65, 267, 275, 284, 286).

### Direct Appeal

The petitioner timely served and filed a notice of appeal. He was represented by Deputy Chief Appellate Defender for Capital Appeals, Robert M. Dudek. On January 29, 2009, Mr. Dudek filed a Final *Anders* Brief of Appellant, *see Anders v. California*, 386 U.S. 738 (1967), on the petitioner's behalf and petitioned to be relieved as counsel (app. 330-44). He presented the following issue to the South Carolina Court of Appeals:

> Whether the court erred by refusing to direct a verdict of acquittal on the murder charge since there was no direct or substantial circumstantial evidence appellant fatally stabbed the decedent, particularly where the pathologist testified the razor that appellant admitted having could not have been the murder weapon?

(Doc. 13-6, final *Anders* brief at 3; app. 333).

The petitioner filed his *pro se* "45 Days, Reply Brief of Appellant" on February 10, 2009. He raised the following issues:

> Whether the court erred by refusing to stop the trial once appellant pleaded with the judge (on page 160-162) and objected to the trial that he had no expert witness on his behalf and that his lawyer was not performing beyond the standards

6

of competence on Nov. 27, 2007, and that his accuser was not at trial, and that third party guilt was a possibility.

(Doc. 13-7, *pro se* brief at 4).

On February 3, 2010, the South Carolina Court of Appeals filed an opinion dismissing the appeal and granting counsel's petition to be relieved *State v. Johnny Paden*, Unpublished Opinion No. 2009-UP-087 (S.C.Ct.App. Feb. 3, 2010) (app. 345-46). The Remittitur was sent to the Greenville County Clerk of Court on February 19, 2010.

**PCR**

The petitioner filed a *pro se* Post-Conviction Relief ("PCR") Application (2010-CP-23-1663) on March 2, 2010, alleging the following grounds:

1.  Ineffective assistance of trial counsel:

a.  Failure to properly investigate.

b.  Failure to call witnesses.

c.  Failure to move to suppress evidence.

d.  Failed to preserve issues.

e.  Failed to adequately challenge expert testimony.

f.  Failure to challenge the forensic scientist's testimony regarding unknown hair fibers

g.  Failure to challenge admission of statement.

h.  Failure to properly conduct discovery

i.  Failure to stop a criminal conspiracy.

(App. 347–53). The State filed its Return on August 20, 2010 (app. 354–58).

On October 5, 2011, an evidentiary hearing was held by the Honorable G. Edward Welmaker, South Carolina Circuit Judge. The petitioner was represented by counsel, Rodney W. Richey. Assistant Attorney General Karen C. Ratigan represented the

7

State.  The petitioner testified on his own behalf, while the State presented the testimony of trial counsel, Mr. Farnsworth (app. 359–95).

During the PCR hearing, the plaintiff testified that his attorney had failed to object to the 911 call and failed to adequately challenge the testimony of the expert witness (app 364, 371, 372).  He further testified that "my accuser, who failed to even come to trial, stated that he saw a black man stab the individual outside.  But he never came to trial to say this and he fleed [*sic*] the state for trial."  The petitioner explained that his "accuser" was "Margarina Salana Lopez (ph).  He accused me of stabbing the decedent and when time of trial he wasn't there, he fleed [*sic*] the state and we couldn't use his -- well the State used his name and something in reference to his name numerous …times and Mr. Farnsworth objected to that certain times but he was my accuser"  (app. 373, 380).

Counsel testified that he was aware of the 911 tape prior to trial, but he could not remember whether he had discussed everything said on it with the petitioner.  Espinoza's credibility was impeached with a prior drug conviction that was elicited on direct examination (app. 389–90).  Also, trial counsel thought that he had objected to a statement that the petitioner stabbed the victim made by a declarant not present at trial.  However, he might have inadvertently missed a statement because the petitioner was talking loudly and excitedly during the witness' testimony (app. 393–94).

Judge Welmaker denied relief and dismissed the application *with prejudice* in an Order of Dismissal filed on July 27, 2011.  The PCR court found that the petitioner's "testimony is not credible … [but that] trial counsel's testimony is credible.  This Court further finds trial counsel adequately conferred with the Applicant, conducted a proper investigation, and was thoroughly competent in his representation" (app. 402).  Thereafter, the PCR judge found as follows:

> This Court finds the Applicant failed to meet his burden of proving trial counsel should have better challenged several witnesses' testimony.  Trial counsel testified he challenged the

credibility of the witness who called 911 by questioning him about his prior convictions. This Court finds trial counsel effectively cross-examined this witness and that the Applicant has failed to articulate what more counsel should have done to question this witness. Trial counsel testified there was no forensic evidence that implicated the Applicant in the crime. This Court finds this lack of DNA evidence was beneficial to the defense and that the Applicant has failed to specify what further lines of inquiry should have been pursued. This Court finds trial counsel articulated valid strategic reasons for how he conducted cross-examination of both the 911 caller and the State's expert. See Roseboro v. State, 317 S.C. 292, 294, 454 S.E.2d 312, 313 (1995) (finding where trial counsel articulates a valid reason for employing a certain strategy, such conduct should not be deemed ineffective assistance of counsel).

This Court finds the Applicant failed to meet his burden of proving trial counsel should have objected to the 911 tape. Specifically, the Applicant argued trial counsel should have objected because the assailant was described as "morro." The Applicant claimed the word "morro" does not mean "black male" as the witness testified but means "my home boy" – thus referring to another Hispanic male and not him. This Court notes trial counsel cross-examined another witness fluent in Spanish on the meaning of "morro" and that it elicited a response consistent with the Applicant's interpretation of the word. (Trial transcript, p.251). Trial counsel then emphasized this point during closing argument. (Trial transcript, p.300). As such, this Court finds the Applicant has failed to prove he was prejudiced by the admission of the 911 tape mentioning the word "morro."

(App. 405–06).

### PCR Appeal

The petitioner timely served and filed a Notice of Appeal. Assistant Appellate Defender Dayne C. Phillips represented him in the state collateral appellate proceedings. On May 16, 2012, Mr. Phillips filed a *Johnson* petition, *see Johnson v. State*, 364 S.E.2d 201, 201 (S.C. 1988)(*per curiam*) ("This Court has approved the withdrawal of counsel in meritless post-conviction appeals, provided the procedures outlined in *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), were followed."), on behalf of the petitioner, in which he presented the following issue:

9

> Did the PCR court err in finding that trial counsel provided effective assistance of counsel where trial counsel failed to conduct a reasonable investigation by not consulting with an independent expert to test the ethnicity of the hairs found in the decedent's hands or to support the defense theory that Petitioner could not have inflicted the fatal stab wound?

(Doc. 13-7, *Johnson* pet. for writ of cert. at 2).

The petitioner subsequently filed a "*Pro Se* Response And Documented Evidence For Writ of Certiorari," in which he alleged:

> 1. Did the PCR court err in finding that petitioner did not present enough evidence to the Amended issue that his accuser was not present at the trial and that he was denied his right to confront his accuser and to have compulsory process for having a complete defense.
>
> 2. Did the PCR court err in finding that trial counsel provided effective assistance of counsel when he failed to object to the physical and mental abuse testimony by co-defendant and failed to object to the only African American male being excluded from the jury selection process.  PCR Amended Issues. Claims not enough evidence presented.
>
> 3. Did the PCR court err [by] not finding that petitioner requested to requested to proceed in his trial *pro se* or be appointed another attorney because he thought his attorney was not being reasonable n his representation and he was ineffective.
>
> 4. Did the PCR court err in finding that trial counsel provided effective assistance of counsel when he fail[ed] to suppress the petitioner['s] statements during the *Jackson [v.] Denno* hearing.
>
> 5. Did the PCR court err in not reviewing the documented evidence that proves that there was a miscarriage of justice.
>
> 6. Did the PCR court err in not ruling on whether petitioner['s] appellate counsel was ineffective.
>
> 7. Did the PCR court err in finding that trial counsel provided effective [assistance of counsel] when he did not object to the malice jury charge which is no longer good law in South Carolina, or should counsel [have] requested a [manslaughter] charge since the State presented evidence that Petitioner was in [an] altercation with [the] decedent prior to his death.

(Doc. 13-11, *pro se* resp. to *Johnson* petition at 4–5).

On September 18, 2013, the South Carolina Supreme Court filed an order denying certiorari and granting counsel's petition to be relieved. The Remittitur was sent to the Greenville County Clerk of Court on October 7, 2013.

## **FEDERAL PETITION**

On August 18, 2014, the petitioner, who is represented by counsel Andrew McKenzie, filed his § 2254 petition (doc. 1). On December 15, 2014, the respondent filed a motion for summary judgment (doc. 14) On February 23, 2015, counsel for the petitioner filed a response in opposition (doc. 24).

In his federal petition the petitioner makes the following claims:

**GROUND ONE:** Denial of Petitioner's Sixth Amendment right to effective assistance of counsel.

**SUPPORTING FACTS**: At the trial of the case, the State presented hearsay statements of alleged witnesses to the incident. There was no hearsay exception that would have allowed their hearsay statements to be admissible. Trial counsel did not object to most of this evidence and did not move to exclude any of it. . . .

[1.] The State presented the testimony of Police Officer Zoila Diaz. Diaz testified that, at the crime scene, she spoke with a Sammy Espinoza. Espinoza had made the 911 call in the case. Diaz testified that Espinoza told her that a black man had stabbed the victim. Trial Transcript p. 45. No objection was made to this testimony.

[2.] Detective Dan Fuller was the lead investigator in the case. He testified that other witnesses had given him the nickname of a possible suspect. The nickname was "John-John". TT p. 109. Fuller testified that he spoke with another witness named Gina Parker. Fuller testified that, immediately after talking with Parker and based on the information she gave him, he arrested Paden for murder. TT pp. 113 and 123. Fuller testified that Parker later denied that "John-John" stabbed the victim. TT pp. 139-140. No objection was made to this testimony by Fuller.

[3.] The 911 caller, Sammy Espinoza, testified … [without objection] that another witness named Maragarito Lopez

11

Solano said that the deceased said that a black man had stabbed him. TT pp. 152-153.

(Doc. 1, pet. at 6; doc. 1-1, att. at 1).

## APPLICABLE LAW AND ANALYSIS

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Commc's Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

12

of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

### Exhaustion

The parties agree that the petitioner has technically satisfied the exhaustion requirement as he no longer has any available state court remedies. The respondent, however, contends that each subpart of his sole ground for relief is procedurally defaulted.

### Procedural Bypass

Procedural bypass, sometimes referred to as procedural bar or procedural default, is the doctrine applied when a petitioner who seeks habeas corpus relief on an issue after he failed to raise that issue at the appropriate time in state court and has no further means of bringing that issue before the state courts. In such a situation, the person has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition. Procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. *See Smith v. Murray*, 477 U.S. 527, 533 (1986). Bypass can occur at any level of the state proceedings if the state has procedural rules that bar its courts from considering claims not raised in a timely fashion.

If a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court. If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. As the Supreme Court has explained:

> [State procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

*Reed v. Ross*, 468 U.S. 1, 10–11 (1984).

"[A] federal court ordinarily may not consider claims that a petitioner failed to raise at the time and in the manner required under state law unless 'the prisoner demonstrates cause for the default and prejudice from the asserted error.'" *Teleguz v.*

*Pearson*, 689 F.3d 322, 327 (4ᵗʰ Cir. 2012) (quoting *House v. Bell*, 547 U.S. 518, 536 (2006)).  To show cause, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," *Murray v. Carrier*, 477 U.S. 478, 488 (1986), or that "the factual or legal basis for the claim was not reasonably available to the claimant at the time of the state proceeding." *Roach v. Angelone*, 176 F.3d 210, 222 (4ᵗʰ Cir. 1999).  "Alternatively, Petitioner may prove that failure to consider the claims will result in a fundamental miscarriage of justice."  *McCarver v. Lee*, 221 F.3d 583, 588 (4ᵗʰ Cir. 2000) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  A fundamental miscarriage of justice equates to the conviction of someone who is actually innocent.  However, "actual innocence" requires "factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In *Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012), the United States Supreme Court carved out a "narrow exception" that modified the "unqualified statement in *Coleman*, [501 U.S. at 754-55] that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default."  In *Martinez*, the Court

> read *Coleman* as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (quoting *Martinez*, 132 S. Ct. at 1318-19, 1320-21).  The Court in *Martinez* also noted:

> When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, i.e., it does not have any merit or that it is wholly without factual

14

support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.

132 S. Ct. at 1319.

***Merits***

Title 28, United States Code, Section 2254(d) and (e) provides in pertinent part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d), (e).

The Fourth Circuit Court of Appeals has stated as follows regarding the standard of review in cases, like the instant case, that are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> For a claim that was adjudicated on the merits in state court proceedings, this Court will not issue a writ of habeas corpus under the AEDPA unless (a) the state court decision is in "square conflict" with Supreme Court precedent that is controlling as to law and fact or (b) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of

15

> legal principles from the relevant [S]upreme [C]ourt precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." *Green v. French*, 143 F.3d 865, 870 (4th Cir.1998). "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." *Id.* When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, however, our review of questions of law and mixed questions of law and fact is *de novo*. *See Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir.1998) (applying pre-AEDPA *de novo* standard of review to claims of ineffective assistance of counsel that were properly raised, but not adjudicated on merits in state court).

*Weeks v. Angelone*, 176 F.3d 249, 257-58 (4th Cir. 1999).

### *Ineffective Assistance of Counsel*

To be entitled to relief on an ineffective assistance claim, the petitioner had to have shown in state court that (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability exists that but for counsel's error, the result of that proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984). However, the review of ineffective assistance of counsel claims in federal habeas is not simply a new review of the merits; rather, habeas review is centered upon whether the state court decision was reasonable. *See* 28 U.S.C. § 2254(d). Additionally, each step in the review process requires deference—deference to counsel and deference to the state court that previously reviewed counsel's actions:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

16

*Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal citations omitted).

### *Hearsay*

In his sole ground for relief, the petitioner claims that trial counsel was ineffective for failing to object to or move to exclude hearsay evidence presented by the State. In particular, he claims that the testimonies of Officer Diaz, Detective Fuller, and Sammy Espinoza contained hearsay and deprived him of his Sixth Amendment right to confront the witnesses against him.

### *1. Officer Diaz*

The petitioner first claims that trial counsel was ineffective for not objecting to Officer Diaz's testimony that Espinoza told her that "a black male had stabbed the victim" (app. 45). The respondent argues that this issue is procedurally defaulted. The undersigned agrees. In the order denying relief, the PCR court noted that the petitioner had made additional allegations in his Motion to Amend Post-Conviction Application (app. 401), and one of those additional allegations was "failure to object to hearsay testimony" (app. 402). It does not appear that any testimony was elicited in the PCR hearing regarding this particular allegation. The court found:

> As to any and all allegations that were raised in the application or at the hearing in this matter and not specifically addressed in this Order, this Court finds the Applicant failed to present any evidence regarding such allegations. Accordingly, this Court finds the Applicant waived such allegations and failed to meet his burden of proof regarding them.

(App. 407). There is no indication in the record that the petitioner filed a Rule 59(e) motion asking the PCR judge to make specific findings of fact and conclusions of law for this allegation. Accordingly, it would not have been preserved for appellate review under state procedural rules. *See Humbert v. State*, 548 S.E.2d 862, 866 (S.C. 2001) (holding that an issue must be raised to and ruled on by the PCR court to be preserved for appellate review); *Marlar v. State*, 653 S.E.2d 266, 267 (S.C.2007) ("Because respondent did not

17

make a Rule 59(e) motion asking the PCR judge to make specific findings of fact and conclusions of law on his allegations, the issues were not preserved for appellate review."). Moreover, this ground would be found to be procedurally defaulted (or barred) under independent and adequate state procedural rules if the petitioner attempted to raise them now. *See Coleman*, 501 U.S. at 730-31.

To the extent the petitioner argues that the ineffective assistance of PCR counsel establishes cause for the default under *Martinez*, such claim fails because this ineffective assistance of trial counsel claim lacks merit. Espinoza's declaration to Officer Diaz qualified as an excited utterance and, therefore, was admissible hearsay under South Carolina law. *See* Rule 803, SCRE (" The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."). It was a declaration relating "to a startling event or condition": the stabbing and subsequent death of the victim. Further, the circumstances surrounding the declaration support the conclusion that the statement was made while the declarant was under the stress of excitement and that the stress of excitement was caused by the startling event. It was made only minutes after his 911 call reporting that the victim had been stabbed and made a dying declaration implicating the petitioner as the person who had stabbed him. Also, the statement was made at the very bloody scene where Espinoza had helped drag the victim minutes earlier, EMS had not yet arrived, and the other men present were still apparently in shock at what had happened. Thus, as argued by the respondent, Officer Diaz's testimony as to what Espinoza told her was properly admitted as an excited utterance under Rule 803(2), SCRE. *See State v. Sims*, 558 S.E.2d 518, 520–21 (S.C. 2002) (the trial judge properly allowed the State to recall responding police officer to testify that victim's minor son, who had witnessed the

18

violent attack on his mother that led to her death, had identified the defendant as the assailant because the boy's statement was an excited utterance).

Espinoza's declaration to Officer Diaz was also admissible as a present sense impression under Rule 803(1), SCRE, which permits the admission of "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."  To be admissible as a present sense impression: (1) the statement must describe or explain an event or condition; (2) the statement must be contemporaneous with the event; and (3) the declarant must have personally perceived the event.  *State v. Hendricks*, 759 S.E.2d 434, 437–38 (S.C. Ct. App. 2014) (citing *State v. Washington*, 665 S.E.2d 602, 604 (S.C. 2008) (stating the admission of an excited utterance "is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion"), and *United States v. Mitchell*, 145 F.3d 572, 576 (3rd Cir.1998) (listing the "three principal requirements" for a statement to be admissible as a present sense impression)).  Although Espinoza did not witness the stabbing, he did witness the victim bleeding to death.  Also, Espinoza acquired the information that he provided by hearing the victim's dying declaration.  As these factors and the other factors set forth above reflect, Officer Diaz's testimony concerning Espinoza's declaration falls within the ambit of Rule 803(1), SCRE.  For the foregoing reasons, the petitioner cannot show that counsel's failure to object to this testimony amounted to deficient performance under *Strickland*.

The petitioner also cannot meet his burden of showing that he was prejudiced as the result of counsel's failure to object.  First, this testimony was cumulative to other evidence implicating the petitioner in the murder.  Specifically, it is cumulative to Espinoza's testimony at trial concerning the dying declaration that the victim made to him; the statement that Espinoza made in the 911 call in which he was trying to get emergency medical attention for the victim, *see Davis v. Washington*, 547 U.S. 813 (2006) (portion of

19

victim's 911 conversation in which she identified defendant was not testimonial for purposes of the Confrontation Clause); Parker's eyewitness testimony that she saw the two men push each other; and the petitioner's custodial statement to Detective Fuller, which also indicated that the petitioner pushed the victim. Likewise, it was cumulative to the petitioner's trial testimony. Additionally, Espinoza was thoroughly cross-examined at trial by trial counsel (app. 156–58). South Carolina appellate courts have consistently held that "the fact testimony is hearsay is unimportant if the declarant testifies and is available for cross-examination." *State v. Caldwell*, 322 S.E.2d 662, 662 (S.C. 1984); *see also, e.g., State v. Garner*, 403 S.E.2d 631, 632 n. 2 (S.C. 1991) ("Appellant also complains the conversations were hearsay. Both agents, Butler, and appellant testified and were available for cross-examination, thus removing any hearsay objection"). As noted above, Espinoza's credibility was also impeached at trial through his prior drug conviction (app. 156).

Moreover, the trial transcript shows that the petitioner's trial counsel made two objections based on hearsay during the direct examination of Espinoza and that the trial judge, after trial counsel's first objection, specifically instructed Espinoza: "Don't tell us what they said" (app. 148).

Based upon the foregoing, the petitioner can show neither deficient performance nor prejudice under *Strickland* resulting from trial counsel's failure to object to Officer Diaz's testimony, and therefore his procedural default of this claim cannot be excused.

### 2. Detective Fuller

The petitioner next argues that his trial counsel should have objected to Detective Fuller's testimony regarding his review of witness statements in which a male with the nickname "John-John" was mentioned (doc. 1-1, att. at 1; *see* app. 109). Detective Fuller testified on direct examination that he spoke with Gina Parker immediately after her arrest for accessory to felony murder (app. 113). Detective Fuller testified that he told

20

Parker that he knew she did not stab the victim, but it was through her that he was going to learn who was with her when it happened. Without testifying as to what Parker said, Detective Fuller stated that, based upon the information Parker gave, the petitioner was arrested for murder (app. 113). On cross-examination by the petitioner's trial counsel, Detective Fuller testified that he spoke with Parker immediately after her arrest, and she said that "John-John" stabbed the victim. However, she later denied that John-John had stabbed the victim (doc. 1-1, att. at 1; *see* app. 139-40).

It does not appear that there was any testimony elicited in the PCR hearing regarding this allegation. Further, there is no indication in the record that the petitioner filed a Rule 59(e) motion asking the PCR judge to make specific findings of fact and conclusions of law for this allegation. As with the previous claim, the petitioner can show neither deficient performance nor prejudice under *Strickland* resulting from trial counsel's failure to object to Detective Fuller's testimony, and therefore his procedural default of this claim cannot be excused. The information elicited by trial counsel on cross-examination of Detective Fuller served to impeach the credibility of the State's only eyewitness to the murder. *See Strickland*, 466 U.S. at 690 (where a defendant focuses on counsel's "strategic choices made after thorough investigation of law and facts," such choices "are virtually unchallengeable"); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987) ("Decisions whether to engage in cross-examination and if so to what extent and in what manner, are ... strategic in nature" and "if reasonably made, will not support an ineffective assistance claim"). Furthermore, Parker testified at trial and was available for cross-examination. *Caldwell*, 322 S.E.2d at 662 ("the fact testimony is hearsay is unimportant if the declarant testifies and is available for cross-examination").

Based upon the foregoing, this allegation is procedurally barred.

### 3. Espinoza

Finally, the petitioner claims that counsel was ineffective for not objecting to Espinoza's testimony that, before he died, the deceased said "moyo, moyo." Espinoza testified that he asked Lopez Solano what "moyo" meant, and Lopez Solano said, "Yeah, that's a black man.  That did the stabbing and left and ran." (app. 152).  The respondent argues that this allegation is procedurally defaulted.  The undersigned agrees.

Espinoza testified that, on January 29, 2006, he was awakened by Lopez Solano knocking on his door.  The trial judge sustained two objections by trial counsel when the witness attempted to testify about what Lopez Solano had told him (app. 147–48). Espinoza went into the apartment where the victim was lying on the floor.  The victim was still breathing.  Espinoza testified at trial that the victim tried to speak, and Espinoza had to "go down with [his] ear and turn down."  He testified that the victim kept saying, "moyo, moyo."  Espinoza asked Lopez Solano, "What's a moyo?"  Espinoza testified that Lopez Solano replied, "[T]hat's a black man" (app. 152).  The prosecutor then asked Espinoza, "What did moyo mean?"  At that point, trial counsel again objected, but the court overruled finding that Espinoza was recounting what the deceased said (app. 152).  The prosecutor then asked Espinoza again what "moyo" meant, and he replied, "A black man.  That's what we call a black man.  We don't say black man, we say, moyo.  And Margarito told me said, Moyo, it's a friend, left running." (app. 153).

At the PCR hearing, in the course of describing what he contended were flaws in the State's case, the petitioner testified that "my accuser, who failed to even come to trial, stated that he saw a black man stab the individual outside. But he never came to trial to say this and he fleed [sic] the state for trial." (app. 373).  The petitioner stated that his "accuser" was "Margarina Salana Lopez (ph)" (app. 380).  The plaintiff further explained:

> He accused me of stabbing the decedent and when time of trial
> he wasn't there, he fleed [(sic)] the state and we couldn't use
> his -- well The State used his name and something in reference

22

> to his name numerous …times and Mr. Farnsworth objected to
> that certain times but he was my accuser. And that's what the
> indictment was derived from him. But he didn't come to trial and
> he fleed [(sic)] the state for trial.

(App. 380).

       The PCR judge considered and ruled upon a related issued, the petitioner's allegation that trial counsel should have objected to the admission of the 911 tape because the assailant was described as "morro" (app. 406).  However, the PCR judge did not make a ruling on the hearsay issue presented here, and the petitioner did not file a Rule 59(e) motion.  He also failed to present this issue to the state supreme court on certiorari.

       The petitioner cannot meet his burden to excuse this procedural default under *Martinez* as he cannot show how he was prejudiced by trial counsel's failure to object to this testimony.  At the PCR hearing, trial counsel testified that he thought that he made an objection to the testimony but, if he did miss this, it was because the petitioner was excitedly talking to him and he did not hear the testimony (app. 393–94).  The trial record supports his recollection.  As discussed above, the record clearly reflects that the trial judge had sustained several objections when Espinoza began to relate statements by others.  Also, the trial judge overruled trial counsel's initial hearsay objection to Espinoza's testimony in which he referred to "moyo" because Espinoza was referring to the victim's dying declaration rather than to what Lopez Solano said (app. 152).  Espinoza's testimony stating that Lopez Solano also said this came immediately after the trial judge's ruling on the objection that counsel made (app. 152–53).  "If counsel was ineffective in any sense, it was only because the client rendered [her] so…. That is not the sort of 'ineffectiveness' for which relief can be granted."  *United States v. Pellerito*, 878 F.2d 1535, 1543 (1st Cir. 1989).

       As with his allegation regarding Officer Diaz's testimony discussed above, this testimony was merely cumulative to other evidence that implicated the petitioner, including

Espinoza's testimony concerning the dying declaration that the victim made to him; the statement that Espinoza made in the 911 call; Parker's eyewitness testimony that she saw the two men push each other; the petitioner's statement; and the petitioner own trial testimony.

Moreover, at trial on the day following Espinoza's testimony, the petitioner complained to the trial judge that the victim actually said "morro," which means "my home boy," and he asked his trial attorney to "get Ms. Diaz back up here and ask her what [morro] meant," but his trial counsel "ignored [him] and went on with something else" (app. 160-61). The petitioner claimed that "the State has lied to the Court and said it means black man" (app. 160). The parties agreed that Officer Diaz could be recalled and examined on the term "morro" (app. 181–84). The petitioner later apologized to the trial judge and counsel for his earlier outburst and said that he had "panicked without listening to the whole thing" and that he knew "[trial counsel's] ability is great and [he had] been knowing that" (app. 248). Officer Diaz was then recalled to the witness stand, and trial counsel asked her what the word "morro" meant; she replied "a young kid, guy" (app. 251). Trial counsel then argued in his closing that Officer Diaz's testimony supported the petitioner's interpretation of the word (app. 300). In considering the petitioner's claim that trial counsel should have objected to the admission of the 911 tape in which the assailant was described as "morro," the PCR court found as follows:

> This Court finds the Applicant failed to meet his burden of proving trial counsel should have objected to the 911 tape. Specifically, the Applicant argued trial counsel should have objected because the assailant was described as "morro." The Applicant claimed the word "morro" does not mean "black male" as the witness testified but means "my home boy" – thus referring to another Hispanic male and not him. This Court notes trial counsel cross-examined another witness fluent in Spanish on the meaning of "morro" and that it elicited a response consistent with the Applicant's interpretation of the word. (Trial transcript, p.251). Trial counsel then emphasized this point during closing argument. (Trial transcript, p.300). As

24

such, this Court finds the Applicant has failed to prove he was prejudiced by the admission of the 911 tape mentioning the word "morro."

(App. 406).

Rule 804(b)(2), SCRE, states that an exception to the hearsay rule exists "[i]n a prosecution for homicide or in a civil action or proceeding," when the declarant's statement was made "while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." To qualify as a "dying declaration," the "declarant does not have to express, in direct terms, his awareness of his condition for his statement to be admissible as a dying declaration. The necessary state of mind can be inferred from the facts and circumstances surrounding the declaration." *State v. McHoney*, 544 S.E.2d 30, 33 (S.C. 2001). Clearly, here, where the victim was bleeding profusely from being stabbed and he died minutes later, the victim's statement was properly admissible as a dying declaration (app. 152-54). Furthermore, it was for the jury to determine whether the victim said "moyo" or "morro."

Based upon the foregoing, the petitioner cannot show prejudice under *Strickland*, and therefore his procedural default of this claim cannot be excused.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the respondent's motion for summary judgment (doc. 14) be granted without the holding of an evidentiary hearing. It is also recommended that the District Court deny a certificate of appealability. The attention of the parties is directed to the notice on the next page.

s/ Kevin F. McDonald
United States Magistrate Judge

July 16, 2015
Greenville, South Carolina

25

**Notice of Right to File Objections to Report and Recommendation**

      The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.**  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (*quoting* Fed. R. Civ. P. 72 advisory committee's note).

      Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk of Court**
**United States District Court**
**300 East Washington Street — Room 239**
**Greenville, South Carolina 29601**

      **Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

26